Robert Malone, Plaintiff Appellant Bruce Yazzie Is your client in the courtroom? He is not. Is he Dene? He is. Which clan? Your Honor, I have to say I don't know his clan identity. Go ahead. Thank you. May it please the court. Mr. Yazzie, although I don't know his clan identity, he is a traditional Navajo. He comes from that pastoral background, grew up on a remote area of the former joint reservation. His family had two home sites or camps that they resided in seasonally, and both of those camps were on land that Helen received benefits, did she not? His mother received benefits and at least two of his siblings received benefits. Is it correct that your client left the family home when he turned 18? Well, no, Your Honor. That is what the hearing officer found. The hearing officer found that when on the date in he had become a resident of New Mexico, and we maintain that that's not true, and that the record does not demonstrate that. When did he join the Marine Corps? He joined the Marine Corps in early 1980. When he was? He was born in 63, so yeah. He was born in 1960, so he turned 18 in May of 78. Right, correct, correct, Your Honor. Yeah, so he would have been, I guess, 20 when he joined the Marine Corps. What was the factual basis for the independent hearing officer determining that he lived in off-reservation in New Mexico? I don't believe that there was one. I mean, he was, in 1978, he was in boarding school in the 11th grade of high school in Tuba City, Arizona on the Navajo Reservation. He dropped out at some point in that spring semester. Actually, Tuba City's on the Hopia Reservation, but go ahead. Well, no, no. I mean, the line runs down right in the middle of the road there, but no, it's Tuba City, also Navajo. It's the difference between Flagstaff, where you're from, and Winslow, where I'm from. Okay. Go ahead. All right, thank you, Your Honor. So in any case, as we've noted, his family members received relocation benefits. We maintain that he was part of her household. Was he not on that? Correct, correct. That is correct, Your Honor. And the letter of denial that O'Neill issued to Mr. Yazzie, it starts off by saying there is uncertainty as to when you relocated from the HPL. You said on your application for benefits, it was 1978. However, O'Neill records show that you relocated with your mother in December 79. And there is a document in the excerpts of record at page 9, which essentially lists Mr. Yazzie as a member of his mother's household and states that Mr. Yazzie's two siblings are in a separate household, that they had applied for benefits on their own, but Mr. Yazzie is with his mother. So O'Neill accepted his 1978 statement on his application, which we maintain it was a simple error. He was filling out the application years later. Can I ask about when he worked for the sawmill? Is the sawmill in Arizona or New Mexico? The sawmill is in Arizona. And that's why when the hearing officer said that he had moved to New Mexico when he turned 18, in the years 1978 and 79, he was only in New Mexico for several months. At the beginning of some months into 1978, he was in the dormitory, high school dormitory in Tuba City. He then went to New Mexico and he worked in a job training program to be a detention officer, for which he was paid. He also studied for his GED exam, which he passed at the end of the summer. And then he went to college, also in Arizona on the Navajo Reservation. And continuing into 79, he was in that same college in Arizona. What does the record show about how often he went back to his mother's residence in White Cone while he was at the sawmill? Well, Your Honor, that's one of the points of dispute. The hearing officer found Mr. Yazzie a credible witness, and we maintain this is a critical issue, to be a credible witness about everything except with the frequency of his return visits to his HPL home site. He didn't quantify him. This is years later, and testifying honestly... That seems to be a critical issue, I mean, because, you know, looking at the siblings, you know, awards, which are in the record, this issue of how often did you go back to White Cone seems significant, and the finding is that it's substantial and recurrent for both of them. But you have the reverse finding. You have the finding that it was not substantial and concurrent and recurrent. And so it seems to be that that issue of how often he went back is critical. And at the sawmill, he's clearly earning enough money, and he's working full-time, that he's got a much stronger case that that is, you know, self-sufficiency. And so the issue is this issue. So that's why I want to focus you on the substantial and recurrent while he was at the sawmill. Well, thank you, Your Honor. I mean, again, it's not... He said that he, if we review his testimony, that he went back as often as he could. When he was working at the sawmill, he resided with his brother, who had the same home site and had a vehicle, and there were also other Navajo... This is the oldest brother, not the same brother as in New Mexico. Correct. I believe his name is Jackson. He's the oldest brother. There were also other Navajo men who worked at that sawmill, and that Mr. Yazzie said that he caught rides with them, and that he went home as frequently as he could. Now, on that subject of the frequency of his return visits, Merlin, his brother Merlin, the other brother in Rama, who the hearing officer found to be a credible witness without reservation, he testified that he returned to his home almost every week or two, and that when he did so, Bruce accompanied him, and both of them testified to their desire and need to be back home and to help the mother and grandparents take care of livestock, and Bruce had his own livestock. And, of course, as we know, I mean, this is an important part of traditional Navajo culture, and so his testimony was every opportunity he could get. While he was in school, while he was at the sawmill, while he was in Rama, and this is corroborated by Merlin, he would go back home. And so while it isn't quantified, and it would be difficult to, 30 years later, to have some specific quantification of those visits, I think it's clear from the record, if we accept his testimony, and that is an important issue, and I just want to say, you know, the district court below, its decision is four pages. Its analysis of the hearing officer's decision is less than one page, and the court stated, it said, we are being asked to reweigh the evidence, and this we cannot do. And therefore, the court just endorsed the hearing officer's determinations without any discussion. And so I think, you know, this, you know, this court and McAllister be celibate. We don't owe factual deference to the district court. I mean, legal deference to the district court, right? I mean, we look at the agency decision, De Novo. Yes. Yeah, so. Well, yes. What's the point here? I thought the point was that he had, he had moved in with his sister, and the hearing officer found that because he was living rent-free with her, he was not self-supporting, and therefore not entitled to payment. That, that is what, well, that's, yes, that's that head of house. I consider that a big issue. I mean, I mean, all the other factors that were analyzed could logically and reasonably lead to a determination that he was self-supporting, and it seems to me that the Ninth Circuit would have to make a rather sweeping determination if they were going to say, hey, he didn't pay rent to his sister and was therefore not self-supporting, notwithstanding all these other factors, right? Well, I, I agree. I mean, this, you know, he, there was a case from the Arizona District Court last year, Tohane versus O'Neill, where it looked at this standard of $1,300 that the agency has always relied on, and that case said this, over the years, the agency and reviewing courts have looked at this as close to a bright line. And he meant that, and that's not an issue here, but this self-supporting issue is, isn't it? Well, but O'Neill has always, over the decades, going back to this memo, it's called the Susan Crystal memo, it's in the addendum to our opening brief, where it was established that $1,300, I mean, it's not a lot of money, but $1,300, which at that point in time was the public assistance that a Navajo individual would receive annually. And so it was stated by that former attorney of O'Neill that if you could show an individual that you had earned $1,300 in a year, that would meet the standard for self-sufficiency. And, and over the decades they've relied on that. The government doesn't contest that. Well, I think, well, now the government, well, they... The government contests, as did the hearing officer, his rental payments and the fact that he was living rent-free at his sister's supported a finding, as far as I could tell, the only thing that supported a finding, that he was not self-sufficient. But this has never, the agency, you know, must, you know, adhere to its course of conduct over the years. It has never gone beyond, in years past, it's never gone beyond this $1,300 standard to see whether somebody's paying rent or not. So you're saying if he made $1,300, he was a self-supporting case closed? As far as determining head of household, that if, if, if your honor would, would review that which cites eight decisions, three of the Ninth Circuit and five of the District Court, that recognize the agency sees $1,300 as meeting that critical issue. Do you want to same time for rebuttal? Yeah, I better do that. Thank you very much. All right, we'll hear now from Mr. Arbab. Excuse me, may it please the court, John Arbab for the Office of Navajo and Hopi Indian Relocation. Your honors, I think from the questioning earlier this morning, it's important to remember what the, what the basic issue in this case is, which is that substantial, this is a substantial evidence case. Substantial evidence supports O'Neill's determination that plaintiff is not entitled to at the time he moved off the Hopi partition land or HPL. Now there, there are alternative holdings here that I think would make resolving this case easier for the court. The hearing officer found that plaintiff moved off the Hopi partition lands by May of 1978. But in the alternative, the hearing officer also accepted, arguendo, the plaintiff's submission that no, I did not move off until December of 1979 when my mother moved off the HPL. And the officer analyzed the claim as if he, on both prongs, as if he had moved in 78 and 79. That's correct, your honor. And, and as to either move off date, the hearing officer found that plaintiff had not carried his burden of showing that he was self-supporting at the time. I mean, the self-supporting, I understand the portion when he's with the sister in New Mexico, because it's a work study program that's like an hour or two combined with the training program in the summer. It really does, it adds up to 1300, but it doesn't really add up to. So that's, so that's the idea. And I understand that, but it doesn't work with the sawmill because at the sawmill, he's way over 1300. He's working full-time. And, you know, even a few instances of, of overtime for a substantial period of time. And the only thing you have there is that he wasn't paying rent to the brother he was staying with in Arizona. So that doesn't seem as strong to say he wasn't self-sufficient, but then the issue in, for that period becomes how often was he going back home? Because that seemed to be, as I saw it, the second part of it. Am I analyzing this correctly? Your honor, I would, I would say a couple of things, not completely agreeing with that. First of all, the December 1979 is his move-off date. And accepting that, the, the recurrence issue doesn't really arise with respect to that prong of the analysis. I would also say that it is. I know, know that I see that that's correct. As I understand his theory, it's, and this, this happens with, with kids. They don't have a formal move-off date. At some point, they just never come back home. They do little things. They go off here. They do this here. They do that there. They may think of their home as still home. And at some point they don't go back. And that seemed to be what his claim was here, that yes, he turned 18 in May of 78, but he moved, there were no jobs near there. So he moved around to different places. He still thought of that as home and went back regularly. And he didn't, you know, lose that residence until his mother moved in December of, of 1979. So it does seem that going back home is relevant to that kind of a theory. Well, the hearing officer did make pretty specific findings about that. And that the, the upshot of it was that the return visits during either of the time periods here in 1978 or 1979 were, were infrequent. The plaintiff didn't own a car during this time period. He had to rely on others for getting rides. All that the record says on the Sawmill point is we have, so the, Robert Malone, is Robert Malone the hearing officer? That's plaintiff's counsel. Oh, that's plaintiff's counsel. Okay. Okay. We're going back home at all. Were you going back home at all during, after you got that job? Yeah, there were, there was a lot of people from my area there that worked out there at the Sawmill and you would catch rides with them. Yeah, I would catch a ride. That's, that's what we have on the Sawmill. And that's, with respect, Your Honor, that's, that's pretty thin. It doesn't really say how often a plaintiff was going back during that time period. But this was 30 years ago, right? Yes. And what, what the hearing officer is trying to get to and what Bruce Yazzie is testifying about happened 30 years ago, correct? It is, it is some time ago at the time of the hearing. Yes, Your Honor. But the, the plaintiff does. Problem with your agreeing to, am I wrong about 30 years? Is it 25, 28? The hearing was in February of 2017. And so we're talking about move off dates in either 1978 or 1979. So yes, 30, 30 plus years later. And that for better or for worse is, is not an uncommon, uncommon situation in these, these cases because the, the administrative process is just happening long after the individual actually moved off the HPL. But if I were to obtain benefits, would Bruce Yazzie have had to prove both self-sufficiency and $1,300 a year? They are two separate inquiries, Your Honor. The $1,300 per year is, is, is, gives rise to a prima facie case of self-sufficiency, self-sufficiency, but it's not a per se rule that if you earned $1,300 in the calendar year that you moved off the HPL, you are automatically going to be deemed self-sufficient. And to go back to Judge Collins' question, I think the, the same problem that plaintiff has with living with his sister in May of 1978 is the same issue that arises with his living in 1979 with his brother, Jackson Yazzie, which is to say that as the hearing officer found during all of these time periods, he was living with relatives. He was not paying anything towards rent, towards maintaining himself, towards utilities, etc. And so even though it is true that in 1979, according to the social security records, he did earn $2,096, I believe, working at the sawmill, still that, it is true that that's over $1,300, but it is not a per se conclusion that he was self-supporting at the time. When the facts show that he was living with his brother, he was being provided room and board free of charge, not, so far as the record shows, not contributing anything from his earnings towards defraying the expense. Well, the answer to my question, counsel, is that even if an applicant such as Bruce Yazzie establishes that he was earning more than $1,300 a year, the hearing officer is entitled to examine the issue of self-sufficiency and that determination would override the earning threshold. Yes, Your Honor, because that $1,300 is just a yardstick. It's not determinative. I mean, an applicant could make less than $1,300 and still be able to show that he was self-supporting, depending on the evidence. So the $1,300 is just one factor amongst many that O'Neill takes into account. What if an applicant was making $100,000 a year and not paying rent and living rent-free under the terms of this particular decision? It would seem that that individual would be not self-supporting and not head of household, right? It really depends on the facts, Your Honor. I think that if someone really made $100,000 in the year that he moved off the HPL, that there would probably be more evidence of the ways in which he maintained and supported himself. Well, maybe, but based here, we don't really particularly know what Bruce Yazzie made. We know he was ahead of a $1,300 yearly income, but he wasn't paying rent and that's what his sister, as I read it, and that's why the hearing officer found that he was not self-supporting head of household. That's right, Your Honor. I think that if you made $100,000 a year, you would probably be more than self-supporting head of household. Well, we do know in this case, the answer is that he was not contributing anything. Was he self-sufficient when he was in the Marine Corps? At that point, he was on his own. He was making $5,000 some dollars a year and according to... You don't pay privates very much in the Marine Corps. Well, there's no... But he was on his own, right? Yes, I think you could say that he was... The hearing officer said he was on his own as of the Marines. The hearing officer found that the first time he could be considered to be self-supporting was in the spring of 1980 when he joined the Marine Corps, but that was well after even his proposed move-off date of December 1979. He joined the Marine Corps in the spring of 1980. I think it's helpful to go back to the regulation that is at issue here, 25 CFR 700.69A2. That is the one that defines a head of household in terms of a single person who actually maintained and supported himself. The problem I have is, you know, the hearing officer says, applicant cannot be considered to have been a self-supporting head of household at any time before he entered military service in the spring of 1980. Applicant's income was from job training or work study during 1978 and 1979, and his basic personal needs for shelter and food were provided by others. I mean, that statement is factually wrong with respect to the sawmill employment in 1979, because that was not job training or work study, and so that at least just seems to be factually incorrect. Your Honor, I think elsewhere in the hearing officer's decision, he focuses on the money that Bruce Yazzie was making in 1979, which was, I think, $2,096, and makes a similar conclusion that he was, that doesn't demonstrate self-support for the same reason that his earlier living with relatives in 78 didn't, and that is, he was, his room and board and his living expenses were being provided by others. Can you point me to where that is? Because I'm looking at later. Okay, he says, additionally, applicants' employment during 1978 and 1979, until he began working at the sawmill, was not designed to promote self-support. The employment was education-related, and the work was to learn skills that could be adapted to self-support at some later time. He goes on about the work study, no documentary evidence about financial aid. So that actually cuts the other way, because that suggests that the sawmill was designed to promote self-support. Is there some other reference here that says something opposite about the sawmill? I think later in the decision, the hearing officer focuses, that part of the decision was focusing on 1978. The hearing officer later, I'm pretty sure, discusses, well, what if we assume, arguendo, his proposed move-off date of December 1979, and that discusses why the money he earned in that calendar year was not sufficient to show self-support as required by the regulation. No, I thought that that went to the going back and forth issue. What he says about the sawmill, he says that at the time, applicant could be considered to have attained head of household status. Perhaps as early as late 1979, when he was working at the sawmill, his White Cone home had been abandoned by his family in favor of relocation. Applicants returned visitation to White Cone while he was living at Snowflake, which is sawmill employment during 1979, was irregular and social, not substantial and recurring. That's that substantial and recurring phrase that we saw in the awards for the other two siblings. So I don't see where I see in this decision that it says that the sawmill employment was not self-sustaining. But maybe you can point me towards that. I'm looking at the hearing officer's decision. I would, I think a good place is excerpts of record 76 towards the top of the page. Applicant detailed his living arrangements while he was a student, and thereafter, and he reported his income during 1978 and 1979. Applicant's description of events does not support a claim of self-support. And then as your honor noted, the hearing officer discusses the question of his return visits to the HPL. And then farther down on that page, the hearing officer indicates that even if applicants' derivative legal residence at White Cone is recognized until he became 18 years old, and he goes on to make findings about that. And then on ER 75, the previous page, the hearing officer finds that applicant cannot be considered to have been self-supporting head of household at any time before he entered military service in the spring of 1980 and goes on to make findings about that. So I think the record is clear that the same problem about self-support that the hearing officer found with respect to 1978 is the same problem with respect to 1979. Perhaps it's not crystal clear, but I think that is the thrust of what the hearing officer was finding, that he was not self-supporting in either 78 or 79. Okay, all right. Unless my colleagues have any further questions. All right, thank you. Why don't we round them up to two minutes because I went a little over with the government. Thank you. On the residency issue, first of all, I want the court to recognize that in 1978 and 1979, half of that time, Mr. Yazzie was residing in a high school and then college dormitory. Can I just focus you on this issue about the sawmill? I mean, because it comes down to, were his visits home irregular and social or substantial and recurrent? And you had the burden and all you have in the record is the three lines that I read where you asked Mr. Yazzie, and he just said there were a lot of people at the sawmill there and he'd catch rides with them. So the hearing officer says, I think that that's social and irregular and not substantial and our standard of review is substantial evidence. How can we say it's not substantial evidence that the party who had the burden didn't carry it? Well, there's no basis in that. I would call it just an arbitrary determination that the hearing officer said these were social visits. I mean, the testimony of Bruce, what he was doing when he went home, not only at the sawmill, and Merlin corroborated this, they had chores at home. They had livestock and his mother and grandparents resided there. His mother was on public assistance. And it's clear throughout his testimony, not just from the sawmill, but the whole time he was in school and when he was in Rama, that he would go home whenever he could. And being able to quantify it 30 years later, testifying honestly, would be very difficult. And I don't, it's not at all, I think, a stretch to think that he could have, I mean, there were many Navajo men, as he testified, working at the sawmill when he was there, as well as his brother Jackson with whom he lived with. And that he, it was very reasonable that he could have returned home with the frequency, with substantial and recurring contacts. Did there come a point in time when there was no home to return to? That's correct, Your Honor. When would that have been? December 7th, 1979, is when his mother relocated. And at that point, that home site was terminated. And there was no longer a legal residence there to which Mr. Yazzie could return to. All right. Thank you, counsel. Thank you. Thank you, Your Honor. The case just argued will be submitted.
judges: HAWKINS, COLLINS, Murphy